**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED AFRICAN ORGANIZATION, *et al.,* ) | | |
| ) | | |
| Plaintiffs, ) | No. 1:22-CV-02599 | |
| ) | | |
| v. ) | | |
| ) | Judge Edmond E. Chang | |
| JOSEPH R. BIDEN, JR., in his official ) | | |
| capacity as President of the United ) | | |
| States of America, *et al.,* ) | | |
| ) | | |
| Defendants. ) | | |

**MEMORANDUM OPINION AND ORDER**

Immigration rates to our Nation vary from country to country around the globe. To promote diversity in those who would pursue American citizenship, Congress makes around 55,000 diversity visas available each year to citizens of countries with low immigration rates. 8 U.S.C. §§ 1151(e), 1153(c). But every year well more than 55,000 people want to apply for a diversity visa. So a would-be immigrant must be selected before even being allowed to apply for the visa itself. The selection is made randomly: each year, the State Department holds a lottery to pick the selectees and to assign a processing priority amongst the selectees. But there is a big catch: if the State Department does not adjudicate an applicant's case *before* the end of the fiscal year in which the applicant was selected in the lottery, then the applicant's eligibility to obtain the visa expires. 8 U.S.C. § 1153(c).

This case was brought by thousands of diversity-visa selectees, plus their spouses and children, who fear that they are running out of time for their applications

to be adjudicated. R. 1, Compl.[1] Taking the laboring oar for those individuals in this case is the lead plaintiff: the United African Organization (known by its acronym, UAO). UAO is a Chicago-based, nonprofit organization comprising a coalition of African community-based organizations. UAO and the individual Plaintiffs allege that the State Department has slowed down the adjudication of diversity-visa applications in two ways: (1) by unlawfully prioritizing non-immigrant visas over diversity applications; and (2) by unlawfully waiting to schedule interviews on or after the selectees' rank numbers become current rather than scheduling the interviews earlier. *Id.* The Plaintiffs claim that the government's policies violate the Immigration and Nationality Act, 8 U.S.C. § 1152(a)(1)(A), and the Administrative Procedure Act, 5 U.S.C. §§ 555(b), 706(2), and ask for adjudication of their visa applications, as well as for compensatory and declaratory relief. Compl. To beat the clock, the Plaintiffs move for a preliminary injunction. *See* R. 26, Mot.; R. 27, Pls.' Br; R. 51, Pls.' Reply. The government opposes the motion and in turn moves to dismiss for lack of subject matter jurisdiction and for failure to adequately state a claim. Fed. R. Civ. P. 12(b)(1), 12(b)(6); R. 39, Defs.' Resp; R. 52, Defs.' Reply. As explained in this Opinion, although there is no doubting the life-altering importance of the diversity-visa applications, the Plaintiffs have not carried their burden in showing that the extraordinary relief of a preliminary injunction is warranted. The motion for preliminary injunction is denied. With an appealable order entered, the Court will hold off on definitively

---

[1]Citations to the record are "R." followed by the docket entry number and, if needed, a page or paragraph number.

deciding the dismissal motion out of an abundance of caution and to allow for more deliberation.

## I. Background

## A. The Diversity Visa Program

Under the Immigration and Nationality Act (known in immigration-law circles as the INA), the "diversity-visa program makes as many as 55,000 visas available annually to citizens of countries with low rates of immigration to the United States." *Shahi v. United States Dep't of State*, 33 F.4th 927, 928 (7th Cir. 2022) (citing 8 U.S.C. §§ 1151(e), 1153(c)). Because the number of would-be applicants exceeds the number of visas, "the State Department holds a lottery to determine priority." *Id.* The lottery is actually split into six geographic regions, with randomly selected winners within each regions. 9 Foreign Affairs Manual (FAM) 502.6-4(c)(2). But lottery winners are not guaranteed a visa—only the *opportunity* to apply for one. Indeed, even the opportunity to apply is conditioned on the State Department adjudicating the application in time: lottery winners are eligible to receive a visa only during the fiscal year in which the applicant was selected to apply. 8 U.S.C. § 1153(e)(2); 22 C.F.R. § 42.33(f). So if the selectee does not receive a visa by the end of the fiscal year, then they are tragically out of luck: "Because the diversity visa program restarts each fiscal year, consular officers may not issue diversity visas after midnight on September 30 of the" fiscal year that the applicant was selected. *Almaqrami v. Pompeo*, 933 F.3d 774, 777 (D.C. Cir. 2019).

### B. Diversity Visa Adjudication

The nuts and bolts of the diversity-visa application process is set forth in a State Department policy manual known as the Foreign Affairs Manual (the State Department refers to it as the FAM). Diversity-visa selectees must fill out Form DS-260, an online application for an immigrant visa. 9 FAM 502.6-4(d)(1)(A). The applications are processed at the Kentucky Consular Center (which the State Department calls the "KCC" for short). 9 FAM 502.6-4(c)(1). The KCC reviews the submitted materials for completion, and if the application is complete, then the KCC deems the applicant "documentarily qualified" for purposes of scheduling a visa interview. 9 FAM 502.6-4(d)(1)(b). Interviews for selectees are determined by their priority-rank number. *See* 9 FAM 502.6-4(d)(2) ("KCC will schedule an appointment for applicants that have completed processing at KCC around the time their regional program rank number is current."); *see* Pls.' Reply, R. 51-2, Exh. B, Decl. of Morgan Miles (09/21/2020) ¶ 5 ("KCC uses the rank number ... to determine the order in which cases are eligible to be scheduled for appointments."); *id.* ("[Diversity visa] selectees with a low rank order, as reflected in their case number, are more likely to get the opportunity to interview, while those with higher numbers are less likely to be scheduled."). Before mid-February 2022, the FAM explained that the "KCC will schedule" an interview at the would-be immigrant's local consular office for the applicant when the applicant's regional lottery rank number is *about to become current*." Pls.' Br., R. 27-2, Exh. B at 12 (emphasis added) (citing prior version of 9 FAM 502.6-4(d)(2)); *see also* 8 U.S.C. § 1202(b) ("All immigrant visa applications shall be reviewed and

4

adjudicated by a consular officer."). So, under the prior policy, the KCC would schedule the interview *in advance* of the selectee's priority-rank number becoming current. But this policy changed on February 18, 2022, when the FAM amended the pertinent section to say that the "KCC will schedule an appointment for applicants that have completed processing at KCC *around the time* their regional program rank number is current." 9 FAM 502.6-4(d)(2) (emphasis added); *see* Compl. ¶ 85. Under the new policy, interview scheduling no longer happens in advance of the priority-rank number becoming current, but instead around the time that it does. In any event, after a successful consular-office interview, if the applicant otherwise meets the criteria to obtain a diversity visa, then the Department "shall" issue the visa to the applicant. 8 U.S.C. § 1153(c); *see Shahi*, 33 F.4th at 928 ("Persons whose applications are successfully adjudicated by the end of the fiscal year receive visas and permanent-residence status.").

## C. Consular Processing

In 2020, with the onset of the global pandemic, the then-president issued a variety of Presidential Proclamations that temporarily suspended the entry of immigrants into the United States. *See* Pres. Proclamations 10014 (Apr. 22, 2020); 10052 (June 22, 2020); 10131 (Dec. 31, 2020). The State Department applied the suspension against diversity-visa applicants because the government did not consider them to meet either the national-interest or mission-critical exceptions to the bans. *See* U.S. Dep't of State, *Mission-Critical Visa Services to Include IR1s and IR2s*, 20 STATE 54966 (June 12, 2020) (describing IR1, CR1, IR2, and CR2 visas for spouses and

5

children of U.S. Citizens as mission-critical). In July 2020, the government resumed some visa-issuance services, but continued to suspend the processing of diversity-visa applications. *See* U.S. Dep't of State, Suspension of Routine Visa Services; 20 STATE 65080 ¶¶ 1–8 (July 22, 2020) (stating the State Department is suspending visa services at all U.S. embassies and consulates due to the COVID-19 pandemic).

In February 2021, the current president issued Presidential Proclamation 10149, which revoked the prior Proclamations that had generally suspended visa processing. *See* 86 Fed. Reg. 11,847 (Feb. 24, 2021). As time and the pandemic continued on, in November 2021, the State Department issued guidance—a "cable" in State-Department jargon—to its consular officers around the world, entitled "Recalibration of Consular Services Prioritization at Posts Abroad." 21 STATE 115378 (Nov. 16, 2021). The cable instructed Chiefs of Mission (the highest-ranking officer of a diplomatic mission in each country) that they "should begin to rebalance workload across consular services to meet the demand of the rebounding travel sector." 21 STATE 115378 at § 2. This means "reintroducing routine NIVs [nonimmigrant visas] for work and tourism into the workload." *Id.* Overall, the State Department implemented a "tiered prioritization guidance" approach to processing various categories of visa applications. *See* Defs.' Resp., R. 39-2, Decl. of Sara Craig (07/12/22) ¶¶ 17–18, 23. In the recalibration cable, the Department asked that consular posts "bear the following in mind as your prioritize" consular services, including a reference to the policy of issuing as many diversity visas as possible:

- Special Consular Services must remain a priority.

6

- Consistent with Congressional direction, post should strive to process immediate relative cases and nonimmigrant K visa applications of fiancés of U.S. citizens within 30 days, and family preference cases within 60 days of the receipt of all necessary documents. This includes adoption cases.

- It is the Department's policy to use as many of the 55,000 diversity visas available each fiscal year as possible.

- Posts should also prioritize cases raised by the Visa Office (e.g., cases related to litigation).

- Seasonal priorities such as H-2 applicants, students, U.S. government funded exchange visitors, and Summer Work and Travel applicants must also be a factor.

21 STATE 115378 at § 6.

### D. Factual Background

Moving on from the overall diversity-visa process, the lead Plaintiff in this case is the United African Organization. UAO is "a dynamic coalition of African community-based organizations" that "advocates on behalf of the African community." Compl. ¶¶ 27–28. UAO has an immigration division that serves constituents facing immigration obstacles. *Id.* ¶¶ 236–237. The individual Plaintiffs are 2,426 selectees for the diversity-visa program and their 2,889 derivative spouses and children (that is, those who would be eligible for diversity visas if their selectee family member were to be approved). *Id.* ¶ 30. All of the individual Plaintiffs allege that they have submitted the required documentation to the KCC and expect that their regional rank numbers became current by June 1, 2022. *Id.* ¶¶ 31–32. As of the time of the Complaint's filing, no individual Plaintiff had received a visa interview or received a diversity visa. *Id.* ¶¶ 215–216.

7

The Plaintiffs filed this action in May 2022, Compl., and filed their motion for preliminary injunction in June 2022, Mot. The Plaintiffs allege that (1) the Recalibration Cable, 21 STATE 115378, "exceeds the authority of the Executive Branch by mandating the prioritization" of nonimmigrant visas over diversity-visa applicants, Compl. ¶¶ 273–291; (2) the government unlawfully withheld the Plaintiffs' diversity-visa applications, *id.* ¶¶ 292–306; (3) the government's policies unreasonably delayed the adjudication of the Plaintiffs' applications, *id.* ¶¶ 307–333; (4) the government's policies are arbitrary and capricious, *id.* ¶¶ 334–357; (5) the policies violate the *Accardi* doctrine, *id.* ¶¶ 358–388; (6) the policies violate the requirement of notice-and-comment for rulemaking, *id.* ¶¶ 389–404; and (7) the government has a mandatory duty to act, *id.* ¶¶ 405–410. In response, the government argues that there is no minimum required number of diversity-visa applications that it must adjudicate and that the government is otherwise scheduling interview and adjudicating applications at a reasonable pace. Defs.' Resp. With this background in place, it is time to tackle the preliminary-injunction motion.

## II. Legal Standard

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 22 (2008). To prevail on a motion for a preliminary injunction, the moving party must show: (1) "it is likely to succeed on the merits"; (2) "it has no adequate remedy at law"; and (3) "it will suffer irreparable harm in the absence of an injunction." *DM Trans, LLC v. Scott*, 38 F.4th 608, 617 (7th Cir.

2022). If the moving party meets these requirements, then the court balances the nature and degree of the potential harm to each party and the public interest. *Valencia v. City of Springfield, Illinois*, 883 F.3d 959, 966 (7th Cir. 2018).

## III. Analysis

### A. Article III Standing

The threshold question in every federal case is whether the federal courts have subject matter jurisdiction over the type of dispute presented. Here, the government challenges whether the Plaintiffs have Article III standing to bring their claims. First up is the standing of UAO.

An organization like the UAO may sue either on its own behalf (organizational standing) or on behalf of its members (associational standing). To show that it has organizational standing, UAO must "show that [it is] under an actual or imminent threat of suffering a concrete and particularized 'injury in fact'; that this injury is fairly traceable to the defendant's conduct; and that it is likely that a favorable judicial decision will prevent or redress the injury." *Common Cause Indiana v. Lawson*, 937 F.3d 944, 949 (7th Cir. 2019) (citing *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009)). An organization has associational standing if "(1) its members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."

*Milwaukee Police Ass'n v. Flynn*, 863 F.3d 636, 639 (7th Cir. 2017) (cleaned up).[2] To establish standing for prospective injunctive relief in particular (whether based on organization standing or associational standing), "a plaintiff must face a real and immediate threat of future injury as opposed to a threat that is merely conjectural or hypothetical." *Simic v. City of Chicago*, 851 F.3d 734, 738 (7th Cir. 2017) (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983)).

For both the challenge against the Recalibration Rule and the challenge against the interview-schedule timing, UAO has standing to challenge those policies. The UAO describes its purpose as "a dynamic coalition of African community-based organizations" that "advocates on behalf of the African community." Compl. ¶¶ 27–28. As evidence of its injury-in-fact, UAO alleges that the government's slow processing of diversity-visa applications, especially those of African selectees, have "caused [a] great deal of strain" on its immigrant rights' division. *Id.* ¶¶ 236, 237, 243, 244. This, in turn, has injured the organization by forcing it to "divert resources and attention into providing legal support for hundreds of diversity visa selectees." *Id.* ¶¶ 245–246.

The government responds by arguing the UAO lacks organizational standing because it has not demonstrated "a frustration of its mission and a diversion of its resources." Defs.' Resp. at 23. Specifically, the government contends that (1) UAO

---

[2]This Opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

decided of its own accord to divert resources to facilitate access to the diversity-visa program, *id.* at 23–24; and (2) UAO has not sufficiently quantified the amount of resources it has spent on the issue, *id.* at 24–25. But these arguments do not carry the day. The concrete diversion of UAO's resources from other aspects of its mission is sufficient to support standing. *See Common Cause*, 937 F.3d at 954 ("Any work to undo a frustrated mission is, by definition, something in furtherance of that mission."). In *Common Cause*, the Seventh Circuit held that voting-rights organizations had organizational standing because the organizations were compelled to divert resources to address an amendment to Indiana's voter-registration laws. *Id.* at 951–955. *Common Cause* explained that *of course* the organization *itself* decided—in the abstract—to expend resources in combatting the amended law; it is not as if the law itself put the organization under a legal compulsion to divert resources. *See id.* at 955. And of course the organization's efforts against the amended law could be said to be fulfilling the organization's prior mission. *Id.* It would make little sense for an organization to take on "additional work if that work had nothing to do with its mission." *Id.* Yet the organization still properly asserted organizational standing because of the diversion of resources. *Id.*

So too here. UAO has not alleged a mere abstract diversion of resources in response to the absence of diversity visas. Instead, UAO has taken concrete, specific steps to advocate for African immigrants in trying to increase the pace diversity-visa application processing. *See* Compl. ¶¶ 236–246. For example, the UAO created a liaison position devoted to dealing with diversity-visa application obstacles and

11

partnered with legal advocates to remedy the harms resulting from the alleged delay. *Id*. ¶¶ 249, 253. These expenditure of resources is sufficient for organizational-standing purposes, especially when the Court must construe the Plaintiffs' well-pleaded allegations as true, no evidentiary hearing has been held, and the government has not engaged in discovery or offered evidence (at least not yet) to rebut the allegations of standing. *See Dexia Cred. Local v. Rogan*, 602 F.3d 879, 884 (7th Cir. 2010) (explaining that "the court need not conduct an evidentiary hearing unless one is called for as a result of a fact issue created by the response to a motion for a preliminary injunction").

Moving beyond organizational standing, UAO also has associational standing. Remember that an organization has associational standing if (1) its members have standing to sue in their own right; (2) the members' interests are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the individual participation of the organizations' members. *Milwaukee Police Ass'n*, 863 F.3d at 639. Those requirements are sufficiently met here. First, on the individual members' own standing to sue, in support of their motion, the Plaintiffs submit the declarations of 47 individual Plaintiffs that have Article III standing to sue. *See, e.g.*, R. 27, Exhs. D–G. Among them is a declaration from Plaintiff Tsahaynew Bogale Tarekegn, who currently lives in Ethiopia and works as a care-and-support officer implementing HIV-assistance programs funded by USAID. R. 27-5, Exh. D, Decl. of Tsahaynew Bogale Tarekegn ¶¶ 2, 14. Although Tarekegn was selected in the 2022 Diversity Visa Lottery and given a case number, she had not

12

been selected for a visa interview at the time of the Complaint's filing. *Id.* ¶¶ 3–7. Tarekgen, like the other individual Plaintiffs, asserts a concrete injury: the loss of the opportunity for an adjudication of the diversity-visa application and the ensuing loss of a diversity visa. It is true that the underlying *merits* question—whether the government is unlawfully failing to adjudicate applications at a sufficiently prompt pace—is a different matter. But for purposes of sufficiently alleging that the Plaintiffs suffered an injury-in-fact, they have done so.

The second and third elements of associational standing are also met. As explained earlier in discussing organizational standing, the individual Plaintiffs' interests in adjudication of their diversity-visa applications and, ultimately, in obtaining diversity visas are fit right in with UAO's interest in promoting African-community interests in the United States. And given that the Plaintiffs seek injunctive relief, which does not require proof of individual damages or otherwise demands participation of the individual Plaintiffs—the relief would require the government to adjudicate the already-submitted applications—UAO meets the third and final element for associational standing. *See Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).[3]

### B. Statutory Subject Matter Jurisdiction

The government next argues that statutory subject matter jurisdiction is missing here. Put another way, even if there is Article III standing, there is no basis for

---

[3]With UAO properly in the case as a named Plaintiff, the government's request to transfer venue to the District of Columbia, Defs.' Resp., R. 39 at 28 n.16, is denied.

subject matter jurisdiction because no federal law confers it. But the government's arguments misconstrue the relief sought by the Plaintiffs. To the government's thinking there is no subject matter jurisdiction because (1) the individual Plaintiffs, as noncitizens, have no basis to challenge the State Department's exercise of discretion, Defs.' Resp at 29–31; and (2) the individual Plaintiffs have no right to an immigrant visa, *id.* at 31–33.

But the Plaintiffs are not outright seeking the issuance of diversity issues as if their applications have been denied and as if they demand an override of the government's decision. Instead, the Plaintiffs seek only to compel the government to adjudicate the applications on time and to vacate (what the Plaintiffs believe to be) unlawful policies that are slowing down the adjudications. These requests fit within the types of relief generally authorized by federal mandamus, 28 U.S.C. § 1361, and the Administrative Procedure Act, 5 U.S.C. § 702. The APA's jurisdiction-stripping provision invoked by the government, 8 U.S.C. § 1252(a)(2)(B), Defs.' Resp. at 30, applies only to discretionary decisions granting or denying specific relief; those are not the types of decisions that the Plaintiffs are targeting here. *See Iddir v. INS*, 301 F.3d 492, 496–97 (7th Cir. 2002) (rejecting jurisdictional challenge to diversity-visa applicant's request to adjudicate application); *Rai v. Biden*, 567 F. Supp. 3d 180, 194 (D.D.C. 2021) (citing cases rejecting jurisdictional challenge to diversity-visa applicants' claims for adjudication), *order clarified sub nom. Rai v. Blinken*, 2021 WL 5765883 (D.D.C. Oct. 25, 2021). So federal-question jurisdiction, 28 U.S.C. § 1331, supplies the statutory basis for subject matter jurisdiction here.

14

## C. Likelihood of Success on the Merits

With subject matter jurisdiction secure, the next question is whether the Plaintiffs have shown a likelihood of success on the merits of their claims. As explained earlier in this Opinion, the Plaintiffs ultimately contend that the government's policies are unlawfully delaying the adjudication of diversity-visa applications. The government challenges UAO with one specific argument, and also advances a variety of arguments against the Plaintiffs' more generally.

### 1. UAO: Zone of Interests

Against UAO specifically, the government argues that UAO "plainly falls outside the zone of interests served by the DV program." Defs.' Resp. at 27. This is a flaw in UAO's claims, according to the government, because a statute ordinarily provides a cause of action "only to plaintiffs whose interests fall within the zone of interests protected by the law invoked." *Bank of Am. Corp. v. City of Miami*, Fla., 137 S. Ct. 1296, 1302 (2017) (cleaned up). But the zone-of-interests test is "not especially demanding in the APA context." *Cook Cnty., Illinois v. Wolf*, 962 F.3d 208, 219 (7th Cir. 2020) (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 130 (2014)) (cleaned up). As explained by the Seventh Circuit, Congress enacted the APA to make agency action reviewable, at least as a presumption. *Id.* (citing *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012)). So a plaintiff's interest need only "arguably" fall within the zone of interests of the statute. *Id.* As explained earlier, the interests of UAO in promoting lawful immigration from the African community to the United States align with the diversity-

visa program. UAO readily satisfies the relatively expansive zone-of-interests inquiry.

## 2. Duty to Adjudicate All Eligible Applications (Counts 1 & 2)

In Count 1 of the Complaint, the Plaintiffs claim that the Recalibration Cable, 21 STATE 115378, with its conferral of discretion to prioritize some nonimmigrant visas over diversity-visa applications, violates the Immigration and Nationality Act's alleged requirement that the government issue *all* 54,850 possible diversity years for the fiscal year. Compl. ¶¶ 273–291. No specific cause of action is explicitly advanced by the Plaintiffs in the Complaint for Count 1, but presumably this claim invokes the APA's bar against unlawfully withheld agency action. 5 U.S.C. § 706(1). Count 2 challenges both the interview-scheduling policy in the Foreign Affairs Manual and the Recalibration Cable as violating the APA because the State Department is unlawfully withholding the adjudication of diversity-visa applications. Compl. ¶¶ 292–306. This particular claim (Count 2) is grounded on both Paragraphs of Section 706. The Plaintiffs assert that under § 706(1) the policies amount to unlawful withholding and unreasonable delay of agency action. 5 U.S.C. § 706(1). The Plaintiffs also assert four of the subparagraphs of § 706(2), which prohibit agency action that is (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to a constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations; and (D) without observance of procedure required by law. § 706(2)(A)–(D).

The crux of the claim that the State Department is unlawfully *withholding* adjudication of the diversity-visa applications (the delay claim is addressed later in the Opinion) is that the Executive Branch is "mandated to allocate and issue 55,000 diversity visas each fiscal year to eligible visa applicants." Compl. ¶ 274. Put another way, in the Plaintiffs' view, the government must issue each and every one of the 54,850 available diversity visas in fiscal year 2022. In response, the government argues that (1) Congress created a ceiling and not a floor for the number of diversity visas that may be issued, Defs.' Resp. at 37, and (2) the Recalibration Cable "does not alter Plaintiffs' substantive right to obtain a DV." Under binding Seventh Circuit precedent, the government is right.

Section 1151(e) of the U.S. Code's immigration title sets the maximum number of diversity visas that can be issued each fiscal year: "The worldwide level of diversity immigrants is equal to 55,000 for each fiscal year."[4] 8 U.S.C. § 1151(e). But this statute does not decree that 55,000 diversity visas *must* be issued each fiscal year. *Shahi*, 33 F.4th at 928 ("The diversity-visa program makes *as many* as 55,000 visas available annually ....") (emphasis added). In *Shahi*, 180 plaintiffs brought suit against the State Department, arguing that they would have secured diversity visas during fiscal year 2020 if their applications had been adjudicated on time. *Id.* The adjudications had been delayed by presidential orders addressing the COVID-19 pandemic and dictating the cessation of diversity-visa processing. *Id.* at 928–929. In rejecting the

---

[4]The 2022 fiscal year cap on diversity visas works out to around 54,850 based on adjustments set by 8 U.S.C. § 1153(c)(1).

claim, the Seventh Circuit explicitly reasoned that the statute setting the fiscal-year eligibility limit was just that—a limit on *eligibility*, not a deadline for administrative action:

> Plaintiffs want us to treat § 1154(a)(1)(I)(ii)(II) as a deadline for administrative action and to hold that the State Department still owes them a duty to adjudication their visa applications. Their problem is that this statute … does not set a time limit for administrative action.

*Id.* at 929. Rather than set a deadline for the State Department to act, the statute "does not impose any duty on the State Department. Instead it specifies the consequence of delay: the applicant's eligibility for a visa expires." *Id.* On that understanding of the statute, "§ 1154(a)(1)(I)(ii)(II) imposes the onus of delay on the aliens." *Id.*

With *Shahi* on the books, any of the Plaintiffs' claims that are premised on an unlawful withholding of any of the 54,850 possible diversity visas face an insurmountable hurdle. Under *Shahi*, there simply is no duty on the State Department to issue *all* of the allotted diversity visas. So, to the extent that the first two counts rely on a statutory duty to issue all 54,850 diversity visas, the Plaintiffs are not likely to succeed on those claims.

### 3. Unreasonable Delay (Count 3)

Although the Plaintiffs make more headway on the claim (Count 3) that the government is unreasonably delaying adjudications, Compl. ¶¶ 307–333, ultimately the lack of a statutory duty to issue all of the available diversity visas (as just explained in the prior section) significantly diminishes the Plaintiffs' likelihood of success on the unreasonable-delay claim. It is true that an agency cannot unreasonably

delay deciding an issue presented to it and cannot unreasonably delay taking agency action. 5 U.S.C. §§ 555(b), 706(1). In determining whether an agency has unreasonably delayed a decision or action, federal courts analyzes the six factors identified in *Telecommunications Research & Action Center v. FCC (TRAC)*, 750 F.2d 70, 79–80 (D.C. Cir. 1984); *see Menominee Indian Tribe of Wis. v. EPA*, 947 F.3d 1065, 1075 (7th Cir. 2020) (Hamilton, J., concurring) (citing *TRAC* for the "general framework for deciding claims of agency delay that courts can apply to unanswered rulemaking petitions"); *see, e.g., Aljabari v. Mayorkas*, 2022 WL 2073047, at *3 (N.D. Ill. June 9, 2022) (applying the *TRAC* factors to applicant seeking to adjust his immigration status). The six considerations are not "ironclad," but they do serve as "useful guidance." *TRAC*, 750 F.2d at 80.[5]

**Factors 1 and 2 (rule of reason and congressional policy).** The first TRAC consideration instructs that the time that agencies take to make decisions must be governed by some "rule of reason," rather than be free-floating and indefinite. *See TRAC*, 750 F.2d at 80. The second factor points out that, naturally, federal courts ought to consider whether *Congress* itself has "provided a timetable or other indication of the speed at which it expects the agency to proceed." *Id.* Here, both of these considerations favor the government on the current record.

---

[5]Here, the sixth *TRAC* consideration is a wash. That factor simply says that no agency "impropriety" needs to be found "lurking" behind the delay "in order to hold that agency action is unreasonably delayed." *TRAC*, 750 F.2d at 80. In any event, here there are no allegations of discriminatory animus or other like impropriety (nor does there need to be for the Plaintiffs to prevail).

It is true the Seventh Circuit has held that the government has a duty to adjudicate diversity-visa applications "in a reasonable period of time." *Iddir*, 301 F.3d at 500. Here, the Plaintiffs rely on an out-of-circuit opinion to argue that the Immigration and Nationality Act "sets an absolute, unyielding deadline by which selectees *must* receive their visas." Pls.' Reply at 17; *see Gomez v. Trump*, 485 F. Supp. 3d 145, 196 (D.D.C.) (citing 8 U.S.C. § 1154(a)(1)(I)(ii)(II)) (emphasis added), amended in part, 486 F. Supp. 3d 445 (D.D.C. 2020), and amended in part sub nom. *Gomez v. Biden*, 2021 WL 1037866 (D.D.C. Feb. 19, 2021). As explained earlier, however, the Seventh Circuit has rejected this reasoning, holding explicitly that § 1154(a)(1)(I)(ii)(II) "does not set a time limit for administrative action." *Shahi*, 33 F.4th at 929. Indeed, the statute "imposes no duty on the State Department" and "imposes the onus of delay on the aliens." *Id.* So reasonableness of the agency's decision-making must be evaluated in the context of no overarching statutory duty to issue all 54,840 diversity visas. Yes, a complete cessation of diversity-visa processing would not square with the general congressional allowance of 55,000 diversity visas each fiscal year. So if the Plaintiffs were faced with that complete stoppage (like the plaintiffs were in *Gomez v. Trump*, 490 F. Supp.3d 276, 288–89 (D.D.C. 2020)), then the outcome would be different. Here, however, no rule of reason requires adjudications at a pace that would guarantee issuance of the full fiscal-year allotment of diversity visas.

**Factors 3 and 5 (human welfare and nature of interests)**. The third and fifth *TRAC* factors consider the impact of delay on the Plaintiffs. The third factor

recognizes the heightened interest that an aggrieved person has when an agency's delay harms someone's health and welfare and not just their pocket book. *TRAC*, 750 F.2d at 80 ("delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake"). Similarly, the fifth factor instructs that the "court should ... take into account the nature and extent of the interests prejudiced by delay." *Id.*

Here, it is not at all surprising that individual Plaintiffs have described the intense interests they have in immigrating to the United States and starting on the path to American citizenship. *See generally* Pls.' Exhs. D–G. For example, Plaintiff Nkaya Manasseh Butale, a citizen of the Democratic Republic of Congo and a 2022 diversity-visa selectee, seeks to bring his wife and two young daughters to the United States in pursuit of a better education and to escape poverty. R. 27-6, Exh. E, Decl. of Nkaya Manasseh Butale ¶¶ 2, 5, 9–12, 26–27. Neither he nor his wife can find work in their home country and have placed their hopes in the diversity-visa program. *Id.* at 13–17, 27. Similarly, Plaintiff Silvana Wagdi William Hanna, a citizen of Sudan and a 2022 diversity-visa selectee, seeks to bring her husband and young daughter to the United States to work and for school, respectively. R. 27-7, Exh. F, Decl. of Silavana Wagdi William Hanna ¶¶ 2–3, 7. She and her family face dangers "every day in Sudan." *Id.* ¶ 11. If she does not receive a diversity visa, then she will be unable to provide her children "with a better education, a safe community, and the basic life essentials such as uncontaminated food and clean water." *Id.* ¶ 14.

As important as those interests are—and they indeed are entitled to great weight—it must also be said that there are important interests on the other side too. The next section explains them.

**Factor 4 (competing priorities)**. The fourth *TRAC* factor instructs federal courts to consider "the effect of expediting delayed action on agency activities of a higher or competing priority." *TRAC*, 750 F.2d at 80. With the crucial background principle that there is no statutory directive to issue *all* of the allocated diversity visas for this fiscal year, on consideration of all of the factors—including the competing priorities—the Plaintiffs have failed to show a likelihood of success that the State Department is unreasonably delaying agency action.

First, the government persuasively details the significant constraints on resources and the unique conditions faced by different consular posts across the world arising out of the COVID-19 pandemic. *See* Craig Decl. ¶¶ 11–24 (discussing extensive impact of COVID-19 on consular operations); Defs.' Resp., R. 39-3, Exh. C, Decl. of Brenda Grewe (07/12/2022) ¶¶ 3–4 (discussing diminished visa processing). Not surprisingly, there is an enormous backlog of *non*immigrant visa applications: in the last full year before the pandemic (fiscal year 2019), consular officers adjudicated 11,734,505 nonimmigrant visa applications. Grewe Decl. ¶ 4. That number dropped down to 5,361,338 in fiscal year 2020 and skidded even further downwards to 3,148,323 in fiscal year 2021. *Id.* The backlog did not happen in a vacuum, because the operations of the Bureau of Consular Affairs relies in large part on passport and visa fees, so staffing shortages have arisen from revenue shortfalls. Craig Decl. ¶ 13.

22

On top of a nonimmigrant-visa backlog, immigrant-visa adjudications also face a substantial backlog. As of June 2022, some 426,486 immigrant-visa applicants—including family-based and employment-based applications—were awaiting interview appointments. Craig Decl. ¶ 22.

Even in the face of the significant resource constraints and backlogs, the State Department has managed to schedule, as of July 31, 2022, interviews of 31,847 selectees. Defs.' Reply, R. 52-1, Exh. A, Decl. of Morgan Miles (08/02/22) ¶ 3. When combined with derivative beneficiaries, the total number of would-be visas associated with those interviews is 66,071. *Id.* To get a sense of what those numbers mean for how many of the 54,850 allotment of visas will actually be issued this fiscal year, consider that the approval rate for adjudications from October 1, 2021, through June 30, 2022, was 73.75%. That approval rate is derived as follows: 23,672 applications were approved in that time period out of a total of 32,098 adjudications, Grewe Decl. ¶ 5, resulting in a 73.75% approval rate. Multiply that approval rate against the 66,071 combined visa applicants plus derivative beneficiaries would equal 48,727 diversity visas issued to selectees and their beneficiaries. That is 88% of the 54,850 allotment for the 2022 fiscal year. The government estimates that, before the end of the fiscal year, they will fit in another 1,200 interviews of selectees (combined with derivative beneficiaries, that would represent around another 2,800 visas). *Id.* Multiply the 73.75% approval rate with 68,871 applicants-plus-beneficiaries, and the number of issued diversity visas would be 50,792, which is 92% of the year's allotment.

23

In an ideal world, there would be no diversity visas left unused. And the State Department does have a duty to adjudicate diversity-visa applications in a reasonable period of time. *Iddir*, 301 F.3d at 500. But the State Department operates in a world of resource constraints and competing priorities. The Secretary of State reasonably returned discretion to Chiefs of Mission to allow for nonimmigrant visas so that tourists, students, and business travelers—with their attendant generation of economic activity in the United States—could resume travel to the country. Craig Decl. ¶ 23. Add nonimmigrant-visa processing that serve other important interests, such as temporary health care workers, seasonal workers, supply-chain transportation crewmembers, and foreign diplomatic missions. *Id.* On balance, then, the Plaintiffs are not likely to succeed on an unreasonable-delay claim when the record evidence shows that the government probably will issue around 88%, and perhaps as much as 92%, of the fiscal-year allotment of diversity visas in the context of the resource constraints and the competing priorities.[6]

---

[6]It should be noted too that the requested injunctive relief also would come at the expense of other selectees who have not joined the lawsuit as an individual plaintiff. Federal courts typically rejected motions for injunctive relief that would just put certain litigants "at the head of the queue … and produce[ ] no net gain." *In re Barr Labs., Inc.*, 930 F.2d 72, 75 (D.C. Cir. 1991); *see Calderon-Ramirez v. McCament*, 877 F.3d 272, 275 (7th Cir. 2017) (rejecting mandamus relief where plaintiff seeking U-visa "fail[ed] to set forth any facts that differentiate himself from other petitioners waiting ahead of him for adjudication."). It would be one thing if this were a class action in which injunctive relief would apply equally to selectees across the board. But this is not a class action, and granting relief specific to the individual named Plaintiffs would necessarily mean, given the resource constraints, that the State Department would skip over other selectees who have not filed a lawsuit.

#### 4. Arbitrary and Capricious (Counts 4 & 5)

The Plaintiffs next contend that the Recalibration Cable and the amended in-
terview-scheduling policy are arbitrary and capricious, and thus violate 5 U.S.C.
§ 706(2)(A). Compl. ¶¶ 334–357 (Counts 4 and 5). There are two problems with this
argument. First, as explained just above in this Opinion, it is not unreasonable for
the government to have reintroduced discretion to process nonimmigrant-visa appli-
cations, or to implement an interview-scheduling policy that will result in issuance of
around 88% of this year's diversity-visa allotment.

Second, the Recalibration Cable and the amended interview-scheduling section
of the FAM do not qualify as the type of final "agency action," 5 U.S.C. § 706(2), that
is subject to being set aside as arbitrary and capricious. To qualify as a final agency
action subject to the APA, the action must be "final," meaning that "the decision in
question must mark the consummation of the agency's decisionmaking process—it
must not be of a merely tentative or interlocutory nature." *Menominee Indian Tribe*,
947 F.3d at 1070 (citing *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)). More im-
portantly for purposes of this case, to be subject to review under the APA, the govern-
ment's action also "must be one by which *rights or obligations* have been determined,
or from which *legal consequences will flow*." *Menominee Indian Tribe*, 947 F.3d at
1070 (emphases added). Courts have interpreted the requirement of "final agency
action" under the APA through a flexible and pragmatic lens. *Dhakal v. Sessions*, 895
F.3d 532, 539 (7th Cir. 2018). "The core question is whether the agency has completed
its decisionmaking process, and whether the result of that process is one that will

directly affect the parties." *Id.* (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992)).

Neither the Recalibration Cable nor the interview-scheduling policy qualify as agency action that sets rights or obligations, or attaches legal consequences on either the State Department or individuals regulated by the Department. On the Recalibration Cable, the Secretary of State has simply returned discretion to Chiefs of Mission to start processing nonimmigrant-visa applications again. The Recalibration Cable bears all the hallmarks of conferring discretion to consular officers rather than binding them on rights, obligations, or legal consequences. As noted earlier in the Opinion, the Recalibration Cable says that the Chiefs should "[p]lease bear the following in mind as you prioritize your work," and then goes on to list five categories of consular services. 21 STATE 115378 at § 6; R. 27-2 at 6–7. The list of categories do not contain any specific, hard-and-fast requirements. "Special Consular Services must remain a priority"—but no further specifics are provided. *Id.* Consular posts "should strive"— but are not required—to process certain type of family-related cases within 30 days. *Id.* Posts should issue as many diversity visas "as possible"—without setting a fixed minimum. *Id.* And so on. *Id.* ("should" prioritize cases raised by the Visa Office; seasonal priorities must also be "a factor"). This type of guidance does not qualify as agency action subject to a direct APA challenge.

It is true that agency policies that purport to serve only as "guidance" still may qualify as final agency action. *See, e.g., Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1021 (D.C. Cir. 2000) (cited by Pls.' Reply at 9). But the Recalibration Cable is quite

26

unlike the type of purported guidance that results in the determination or rights, obligations, or legal consequences. In *Appalachian Power*, for instance, an EPA "guidance" document set forth various requirements for periodic monitoring of emissions by stationary sources of air pollution. 208 F.3d at 1019–20. The 19 single-spaced pages detailed what sort of monitoring could satisfy the periodic monitoring required by a statute. *Id.* at 1017 (citing 42 U.S.C. § 7661a(b)). In sharp contrast, the Recalibration Cable does not purport to define any statute that imposes rights, obligations, or legal consequences on anyone. Nor does the rebalancing of priorities purport to govern the primary conduct of anyone regulated by the State Department. Even though the rebalancing does, in effect, slow down the processing of diversity-visa applications, it does so without the kind of legal consequence required to qualify as an agency action under the APA.

The same goes for the amended interview-scheduling policy in the FAM. Yes, the FAM is billed online as the State Department's "authoritative source" on the Department's "policies" and "procedures." Foreign Affairs Manual and Handbook, U.S. Dep't of State, fam.state.gov (last visited August 8, 2022). But the interview-scheduling policy only instructs the Kentucky Consular Center on when to schedule interviews. 9 FAM 502.6-4(d)(2). Like the Recalibration Cable, this is not a policy that determines the rights, obligations, or legal consequences of any person regulated by the State Department. Nor does it interpret any other conduct-governing statute or regulation that would in turn result in a consular official imposing some rule of conduct on a regulated person. At bottom, the Plaintiffs have failed to show that this

27

type of internal operational directive is subject to an arbitrary-and-capricious chal-
lenge. There is no sufficient likelihood of success on Counts 4 and 5.

### 5. *Accardi* Doctrine (Counts 6 & 7)

Next, the Plaintiffs contend that the government's failure to schedule inter-
views and the failure to issue as many diversity visas as possible violate the *Accardi*
doctrine of administrative law. Compl. ¶¶ 358–377 (Count 6); *id.* ¶¶ 378–388 (Count
7). In *United States ex rel. Accardi v. Shaughnessy*, the Supreme Court held that the
Board of Immigration Appeals was required to follow its own regulations in deciding
whether to suspend deportation. 347 U.S. 260, 268 (1954). In establishing what is
now known as the *Accardi* doctrine, the Supreme Court not surprisingly required the
agency to follow its own regulations. *Id.* The Plaintiffs here argue that the State De-
partment has violated the *Accardi* doctrine by failing to abide by various provisions
of the FAM in setting up interviews and failing to adjudicate as many diversity visas
"as possible," 21 STATE 115378 at § 6. But the *Accardi* doctrine "generally does not
apply to an agency's internal memoranda, at least those that are neither designed to
protect individual rights nor intended to have the force of law." *Zelaya Diaz v. Rosen*,
986 F.3d 687, 690 (7th Cir. 2021). Here, neither the FAM's internal operational di-
rectives nor the Recalibration Cable's rebalancing of consular-service priorities have
the force of law. As the government correctly points out, Chapter 9 of the FAM simply
"provides consular officers the guidance needed to make informed decisions," *see*
Defs.' Reply at 19 (citing 9 FAM 101.1-1), but do not otherwise create enforceable
legal rights for diversity-visa applicants. So too for the highly discretionary

28

Recalibration Cable, as explained earlier in the Opinion. On the *Accardi* claims, the Plaintiffs fall short of a likelihood of success on the merits.

### 6. Notice and Comment (Count 8)

The Plaintiffs contend that government's change to the interview-scheduling policy, 9 FAM § 502.6-4(d)(2), and the issuance of the Recalibration Rule, 21 STATE 115378, violate notice-and-comment rulemaking procedures. Compl. ¶¶ 389–404. But the APA requires notice and comment only when an agency issues a legislative rule, *see* 5 U.S.C. § 553(b)(c), that is, only a rule that has the "force and effect of law." *Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 96 (2015). The notice-and-comment requirement does not apply to interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice." 5 U.S.C. § 553(b)(A). As explained earlier in the Opinion, neither the Recalibration Cable nor the interview-scheduling policy impose any substantive or procedural requirement outside the State Department. Both of the policies fit well within a rule of agency "procedure" or "practice," rather than a legislative rule. There is little prospect of success on the notice-and-comment claims.

### 7. Mandamus (Count 9)

Lastly, the Plaintiffs label as Count 9 a claim invoking the authority of district courts to issue a writ of mandamus to compel an agency to perform a duty owed to a plaintiff. 28 U.S.C. § 1361. But mandamus relief is granted only "if the plaintiff can demonstrate that the three enumerated conditions are present: (1) a clear right to the relief sought; (2) that the defendant has a duty to do the act in question; and (3) no

other adequate remedy is available." *Calderon-Ramirez v. McCament*, 877 F.3d 272, 275 (7th Cir. 2017) (cleaned up). So, in essence, the statutory authorization of mandamus simply makes clear that a federal court may compel a federal officer to perform a duty owed to the plaintiff. The mandamus statute is *not* itself a substantive source of legal duties—it operates as authorization to grant a remedy *if* a duty imposed *elsewhere* has not been performed. As explained in this Opinion, because the Plaintiffs have not shown a likelihood of success on the merits of any of their other claims, the mandamus claim too is also not likely to succeed.

## IV. Conclusion

Because the Plaintiffs have fallen short of showing a likelihood of success on the merits, there is no need to consider the remaining preliminary-injunction factors. The motion for preliminary injunction is denied. As explained earlier in the Opinion, this denial does not diminish the intense interests at stake for the Plaintiffs. And, as the Seventh Circuit too noted, it is appropriate to ask whether "it would have been wiser for Congress to enact a deadline for administrative action—for why should people lose entitlements because of things outside their control?" *Shahi*, 33 F.4th at 929. "[B]ut that's not the sort of statute on the books." *Id.*

On the dismissal motion, as mentioned in the Opinion's opening section, the handwriting might very well be on the wall, but the Court will hold off on definitively

deciding that motion to allow for more deliberation and to more promptly enter an appealable order (that is, the denial of the preliminary injunction).

ENTERED:

Honorable Edmond E. Chang
United States District Judge

DATE: August 9, 2022

31